CONSOLIDATED DRY GOODS
COMPANY
v.
UNITED STATES of America.
Civ. A. No. 57–238.

United States District Court
D. Massachusetts.

Feb. 5, 1960.

Ropes, Gray, Best, Coolidge & Rugg, Harry K. Mansfield, Boston, Mass., for plaintiff.

Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass, for defendant.

FRANCIS J. W. FORD, District Judge.

This is an action to recover alleged overpayments by plaintiff on its federal income taxes for its fiscal years ending January 31, 1948, through January 31, 1955, inclusive. The sole issue involved is whether plaintiff is entitled to report for income tax purposes profits from sales of merchandise made under its Cycle Budget Account Plan in accordance with the installment method provided in § 44(a) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 44(a) and § 453(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 453(a).

Plaintiff is a corporation operating retail department stores at various locations in Massachusetts and New York. It reports its income on the accrual method of accounting. Its sales of merchandise to customers are made under several different arrangements for payment, in addition to the Cycle Budget plan to be described later. It sells for cash. It sells under a conventional charge account agreement under which merchandise purchased during one billing period is to be paid for in full prior to the next billing date. It also sells merchandise under conditional sales agreements under which payment is to be made in regular fixed installments until completely liquidated, with Consolidated retaining title and the right of repossession until the purchase price is paid in full.

The Cycle Budget Account Plan is a typical example of what is known in the merchandising field as a revolving credit plan. Under this plan the store by agreement with the customer establishes a credit limit for the customer, generally fixed at six times the monthly payments which it is determined the customer is able to pay. The customer may then purchase merchandise on credit up to this limit. The customer agrees to make the fixed monthly payment each month (together with a service charge of one per cent of the unpaid balance) so long as there remains any unpaid balance on the account. When a customer has made purchases up to the credit limit, no further purchases can be made on the account until the unpaid balance is reduced. Whenever the unpaid balance is less than the credit limit, the customer may make further purchases on credit until the credit limit is reached. If in any month charges are made to the account in excess of the credit limit, the customer at his next monthly payment must pay this excess in addition to the regular monthly payment.

The revolving credit plan seems to have first been used about 1938 and the use of plans of this general type by retail stores has become widespread since World War II. Sales under such a plan resemble sales under what may be called the traditional installment plan in that the purchaser makes payment by a series of payments at regular intervals over a period of time. There are some differences however between these sales and those under the traditional installment plan. The latter ordinarily involves a separate contract for each item of property purchased, providing for a series of payments specifically applicable to the purchase price of that piece of property. Usually the seller also retains some type of security interest in the property, such as reservation of a security title under a conditional sales agreement, until the property is fully paid for. Under the revolving credit plan there is no retention of any security interest and no specific contract as to each item purchased. The

buyer's regular payments are not specifically attributable to the purchase price of any single item but only go to reduce the unpaid balance on what may be the total purchase price of several items purchased at different times.

The issue is whether the term "installment plan" as used in the statute is to be interpreted as applying only to the traditional installment plan, or whether it has a meaning broad enough to include a development or variation thereof such as the plaintiff's cycle budget plan.

The governing statutory provision contains no definition of what is meant by installment plan. There is no express definition included in the applicable Treasury Regulations. The government seeks to find support for its view that only the traditional type of installment plan is included by implications which it seeks to draw from certain language in these regulations. Treasury Regulations 65, Article 42, promulgated under the Revenue Act of 1924, Treasury Regulations 111, Section 29.44–1, promulgated under the Internal Revenue Code of 1939, Treasury Regulations 118, Section 39.-44–1, promulgated under the Internal Revenue Code of 1939, and Treasury Regulations on Income Tax (1954 Code) Section 1.453–2, all contain references to the use by sellers on the installment plan of various methods used by dealers to protect themselves in case of default, such as retention of title by the vendor under a conditional sales agreement, lien agreements, chattel mortgage agreements or conveyance to a trustee. But nowhere do these regulations say that use of one of these devices is a necessary part of an installment sale. Regulations 65, 111 and 118 say only that dealers selling on the installment plan "usually adopt one of four ways of protecting themselves." The latest regulations under the 1954 Code state "A person who regularly sells personal property on the installment plan may adopt (but is not required to do so), one of the following four ways of protecting his interest in case of default by the purchaser:" This certainly does not make the retention of

some sort of security interest by the seller, as government contends, an essential feature of an installment sale. The language of the earlier regulations is merely a description of what was at the time they were issued a feature of most installment sales since most such sales were then of the traditional type. It is significant that the language was changed in the 1954 Regulations. The new language amounts to a recognition that there have been changes in the business of installment selling, so that the retention of a security interest by the seller can no longer be accurately said to be a usual characteristic of such sales.

Government argues that the statement in Regulations 65 and 111 (omitted in Regulations 118 and the 1954 Regulations) that "Dealers in personal property ordinarily sell either for cash or on the personal credit of the purchaser or on the installment plan," necessarily defines an installment sale as one made on the security of some retained interest in the property and excludes a sale made on personal credit without such security. These regulations themselves admit that retention of a security interest in the case of installment sales, while the usual practice was not necessarily the universal one. The language of the regulations appears to be intended merely as a general description of current business practices and not intended to be a definition of the term "installment plan." The more probable explanation of the sentence is that by sales on personal credit the regulations were referring to sales made on an ordinary charge account.

The first statutory provision for a special method of reporting income from installment sales for income tax purposes was § 212(d) of the Revenue Act of 1926, 26 U.S.C.A.Int.Rev.Acts, page 162. The government relies on a statement in the Senate Finance Committee Report (S.Rep. No. 52, 69th Cong., 1st Sess., p. 19 (1926)) in which the committee, referring to § 212(d) of the Revenue Act of 1926 said, "Deferred-payment contracts other than installment contracts are not affected by the committee amend-

ment." It is clear, however, from the rest of the paragraph that it referred to two specific types of deferred contract which were not considered to be installment sales, viz., isolated sales of personal property where the initial payment exceeded 25 per cent of the price and sales of real property where obligations were received by the seller having a fair market value which were to be regarded as the equivalent of cash. Beyond these exclusions the report does not attempt to define installment sales and hence this statement casts no light on the problem involved in this case.

In the absence of any express definition or even any clear indication in the statute, regulations or legislative history as to the meaning to be given to the words "installment plan" plaintiff urges that Congress should be presumed to have used these words in their ordinary meaning or the meaning they have in commercial usage.

The term "installment selling" is defined in Webster's New International Dictionary, Second Edition (1950) Unabridged, as follows: "A transfer of wealth with an agreement that payment therefor shall be made piecemeal in accordance with a prescribed plan. Called also installment plan." Black's Law Dictionary, Third Edition (1944), defines "installments" as: "Different portions of the same debt payable at different successive periods as agreed." Under these definitions plaintiff's Cycle Budget Account Plan would clearly be an installment plan.

■ The evidence offered by plaintiff clearly establishes that in the practice and usage of the retail trade the term "installment plan" is broad enough to include plaintiff's plan. In trade usage any plan involving an arrangement for the sale of merchandise with payment to be made in two or more periodic payments is an installment plan. Numerous text books were cited to show that this is the accepted trade definition and that revolving credit plans in their various forms are considered in the retail trade

to be installment plans. A similar usage prevails in the field of statistics relating to retail trade. The Federal Reserve Board follows this usage in compiling its statistics of business activity. Thus the Federal Reserve Bulletin for April 1953 explains, on page 341, that "installment credit includes all consumer credit held by financial institutions and retail dealers which is scheduled to be repaid in two or more installments. Revolving credit, budget, or coupon accounts are treated as installment credit rather than as charge accounts because they involve scheduled repayment on a periodic basis."

A similar use of this broad trade concept of "installment credit" is found in Executive Order No. 8843, 50 U.S.C.A. Appendix, § 2131 note, which in 1941 defined installment credit as follows:

"(f) An extension of credit is an extension of 'instalment credit' if the obligor undertakes to repay the credit in two or more scheduled payments or undertakes to make two or more scheduled payments or deposits usable to liquidate the credit * * *."

■■ In construing the meaning of a statutory provision the purpose underlying the provision should also be taken into consideration. "The method of reporting income on the installment basis was enacted by Congress as a relief provision. The chief idea which motivated Congress in allowing the installment method of reporting income was to enable a merchant to actually realize the profit arising out of each installment before the tax was paid. In other words, the tax could be paid from the proceeds collected rather than be advanced by the taxpayer." Thomas F. Prendergast, Executor, 22 B.T.A. 1259. With respect to this purpose, the plaintiff's plan seems to stand on the same footing as the traditional installment plan, for in both cases the seller realizes his profit on a transaction only when he collects the selling price of his merchandise in periodic payments.

■ Thus the plaintiff's Cycle Budget Account Plan is fairly embraced within the ordinary meaning and the accepted trade meaning of the words "installment plan." When the statute gives no indication that any more restricted meaning was intended and the ordinary and accepted interpretation of the words is in accord with the purpose of the statute, that meaning should be given to the term used in the statute.

■■ It is true that the particular plan now used by plaintiff was probably unknown in 1926 when this statutory provision was first enacted. But it cannot be held that the meaning of these words as used in the 1926 Act and as repeated in successive statutes must be frozen to such an extent that they now refer only to the exact forms of installment plan known in 1926. The words must be interpreted to include such changes and developments in installment selling as fairly fall within the generic meaning of sales "on the installment plan." The Constitution is not interpreted in the light of conditions that existed in 1789. Barr v. United States, 324 U.S. 83, 90, 65 S.Ct. 522, 89 L.Ed. 765; People of Puerto Rico v. Shell Co., 302 U.S. 253, 258, 58 S.Ct. 167, 82 L.Ed. 235; Burge v. Commissioner of Internal Revenue, 4 Cir., 253 F.2d 765, 769. Plaintiff's plan is such a development. It may have dropped some of the features which had commonly been found in earlier installment plans, such as retention of a security interest or the attribution of each payment to the purchase price of one specific item sold, because such features were impracticable in a plan designed to cover not a single large sale but a series of transactions involving numerous smaller items. But it has retained the essential feature of an arrangement for the payment by the purchaser for the merchandise sold to him in a series of periodic payments of an agreed part or installment of the debt due. Hence it falls fairly within the meaning of the words "installment plan" as used in the applicable statutes.

Judgment will be entered for plaintiff.